Whitaker, Judge,
concurring:
I definitely disapprove of plaintiff’s action in this case, but apparently he was technically within the law, as then con *649 strued by the Comptroller General and the Civil Service Commission, and is technically entitled to recover.
I reluctantly concur.
J ones, Chief Judge, joins in this opinion.
BINDINGS 03? FACT
The court, having considered the evidence, the report of Trial Commissioner C. Murray Bernhardt, the briefs and arguments of counsel, makes findings of fact as follows:
1. Plaintiff is a citizen of the United States. He was continuously employed by the United States in various clerical and administrative positions commencing about 1911. At all times pertinent to this case plaintiff was employed in the Office of The Housing Expediter, which administered rent control legislation, or its successor, the Office of Eent Stabilization, and had permanent Civil Service status.
2. a. The Housing and Eent Act of 1947 was administered by the Housing Expediter who annually faced critical problems of continuing rent controls through an extension of that Act, and of obtaining appropriations to operate. If rent controls were extended, which was usually delayed to about June 29 or 30 of each year, funds for administration followed. For illustration, the Appropriation Acts for the fiscal years starting July 1, 1947, and July 1,1948, were not approved until June 30 of those years. The Independent Offices Appropriation Act for the fiscal year ended June 30, 1950, which appropriated $17,500,000 to operate OHE, was approved August 24,1949.
b. The Housing Expediter, Tighe Woods, and the OHE General Counsel, Edwin Dupree, Jr., were the principal officials concerned with the legislative problems of extending the Act and obtaining funds.
3. A bill to further extend the Housing and Eent Act of 1947 for one year, i. e., to June 30, 1951, was introduced in the Senate March 3,1950.
4. The General Appropriation Bill for the fiscal year 1951 (ending June 30, 1951) was introduced March 21, 1950. It did not apply to OHE. An amendment thereto was proposed prior to its passage in the House on May 10, 1950, by *650 Representative Thomas, Chairman of the House Appropriations Committee’s Subcommittee on Independent Offices, which required that Government employees use their 1950 annual leave by December 31,1950,[1] or lose it.
5. As of January 1, 1950, the Office of Housing Expediter had 4,153 employees with a potential liability for annual leave of $2,868,082.44. Of this $280,240.62 represented possible liability to 349 employees in the National Office in Washington. Under then existing law 60 days, totaling 480 hours of leave, could be carried over into the succeeding calendar year but 90 days could be accumulated during the existing national emergency. (See post, finding 14.) The plaintiff Madigan, then Deputy Housing Expediter (Administration), had accumulated 90 days (720 hours), as had Edwin D. Dupree, Jr., the General Counsel, and some other key officials. The Director of the Personnel Branch, Mrs. Linda A. Matteo, had a balance of 48 days and 1 hour (385 hours).
6. a. The Urgent Deficiency Appropriation Act of 1950, approved March 27,1950, appropriated an additional amount of $4,000,000 for OHE but provided that “$2,600,000 shall be available for the payment of terminal leave only” (64 Stat. 37). This left but $1,400,000 for operating funds.
b. On March 31, 1950, the Housing Expediter wrote the Comptroller General and inquired if $800,000 expended out of operating funds for terminal leave prior to passage of the Urgent Deficiency Appropriation Act on March 27 could be charged against the $2,600,000 earmarked for terminal leave, so as to increase the operating funds. The Comptroller General advised that this was contrary to the intent of Congress and unauthorized.
7. In the 1950 fiscal year there was a decline in the areas under federal rent controls. In the first six months of 1950 federal controls went off in New York State, Alabama, Virginia, and in several cities. This had reduced the number of OHE offices from 267 to 215, and OHE employees from 4,077 to 2,642, but substantial activities were continued. As of May 1, 1950, OHE records showed the dollar value of accumulated and current annual leave to be $2,300,859.23 *651 for 2,847 employees, of which $277,892.33 was applicable to 320 employees in the National Office. As of May 26, 1950, about 2,700 employees remained, with 290 in the National Office.
8. The Thomas Amendment to the General Appropriation Bill, 1950, section 1112, passed the House May 10, 1950. It was a subject of common discussion in Government employment circles. However, OHE was not included in the General Appropriation Bill.
9. Mr. Woods, head of OHE, and Mr. Dupree, its General Counsel, who, as stated, handled the legislative problems, anticipated that rent controls would be extended and that OHE would be continued in the fiscal year 1951, although there was some question as to curtailment of its functions and scope by the end of 1950. Consequently, the Housing Expediter endeavored to avoid crippling the agency through a loss of experienced personnel. It was his experience that legislation moved slowly in the 81st Congress for various reasons, including the fact that an omnibus appropriation bill was inaugurated that year. It was also more difficult at that time to obtain funds to operate OHE due to changes in the economic need for rent control.
10. a. Because of the expiration of legislative authority and deficiency of funds necessary to function through and after June 30, 1950, all OHE employees had been duly notified May 26, 1950, of their separation on June 30, 1950, by reduction in force, commonly known as a RIF. Approximately 1,600 employees were to cease active duty June 6, and 1,130 were to man the offices and to cease active duty on June 30. Due to the shortage of operating funds the Housing Expediter planned that all employees go on one week of voluntary leave without pay, the leaves to be staggered in the weeks of June 12 and June 19, and had cleared this with representatives of the House and Senate Appropriations Subcommittees, even though it was a practice generally not favored in Congress.
b. The payroll for the last week of the 1950 fiscal year was also expected to be paid out of the 1951 appropriations, since it was part of a pay period falling into fiscal year 1951.
11. As Deputy Housing Expediter (Administration), *652 Madigan issued formal notices to himself and Mrs. Matteo of their BIF’s, which read in part as follows:
Upon separation from the service of the Office of the Housing Expediter, you will receive lump-sum payment for unused annual leave which you have accrued. (Because of the time lag involved in the preparation of Government payrolls, you should anticipate a delay of at least two weeks before the check for final payment can be made.)
❖ * * * *
With an extension of the Act, and the appropriation of sufficient funds to make it possible to recall any notices, such notices will be recalled in strict order of preference, and retention preference regulations of the Civil Service Commission will be followed. If it is possible to recall your notice you will be so notified in writing.
If, with the extension of the Act, your notice is not recalled, the termination of your service will have resulted from a reduction in force in the competitive level in which your position falls. * * *
As of June 3, 1950, Madigan amended these notices to continue himself and Mrs. Matteo on duty to June 30, rather than June 6.
12. a. The Housing Expediter had appointed William G. Barr as General Manager of OHE on January 30, 1950. In the absence of the Housing Expediter, the General Counsel, Mr. Dupree, usually acted, although Dupree also reported to the General Manager. Mr. Madigan was employed by OHE in the latter part of January 1941 and, as Deputy Housing Expediter for Administration, was directly concerned with its fiscal and personnel problems, including the direction, planning, and coordination of an administrative management program through the Budget and Finance, Administrative Services, and Personnel Branches, all of which comprised the Administration Division, which he headed. The Director of the Personnel Branch, Mrs. Matteo, had had full responsibility for the activities of her branch since October 30,1947, and had full responsibility for planning, organizing, and directing a sound personnel program. The Housing Expediter had delegated to her the power to take final action on matters pertaining to the employment and general *653 administration of all personnel in OHE in the absence of Madigan or when designated by Madigan to act in his stead. She served as assistant and alternate to Madigan and in his absence performed the functions of Deputy Housing Expediter. Madigan both rated and reviewed Mrs. Matteo’s efficiency ratings and, on various occasions, designated her to act as Deputy Housing Expediter for Administration.
b. The Housing Expediter relied on this administrative staff to see that the personnel and budgetary regulations were properly followed.
13. Late in May 1950 Madigan conceived an alternative plan to weather the financial crisis faced by the agency to keep its operating personnel together until forthcoming appropriations were available. The plan, which involved use of part of the remaining balance of the earlier $2,600,000 appropriation earmarked for terminal leave payments, was to separate numerous employees from their permanent positions, pay them in lump sums for all accumulated leave, and immediately rehire them in the same positions under temporary appointments, thus using most of the balance of the earmarked $2,600,000 appropriation and freeing OHE’s expected 1951 appropriation from this burden.
14. The Annual and Sick Leave Act[2] of March 14, 1936 (49 Stat. 1161), as amended December 17, 1942 (56 Stat. 1052), Title 5 U. S. C., provided, in part—
§ 30b. Same; annual leave; accumulation; temporary employees.
_ With the exception of [exceptions stated] * * * all civilian officers and employees of the United States wherever stationed * * * regardless of their tenure, in addition to any accrued leave, shall be entitled to twenty-six days’ annual leave with pay each calendar year, exclusive of Sundays and holidays: Provided, That the part unused in any year shall be accumulated for succeeding years until it totals not exceeding sixty days: Provided further, That during the national emergency declared by the President of the United States on September 8,1939, the leave unused by the employees of the departments, independent establishments, and agencies, *654 not in other form commuted or compensated, shall be accumulated for succeeding years until it totals not exceeding ninety days: And provided further, That when the unused leave accumulated equals or exceeds sixty days in the aggregate, not more than fifteen days of unused leave may be further accumulated in any one calendar year. Sections 29a, 30b-30e, and 301 of this title shall not affect any sick leave to which employees are now or may hereafter be entitled. Temporary employees, except temporary employees engaged on construction work at hourly rates, shall be entitled to two and one-half days leave for each month of service. The annual leave herein authorized shall be granted at such times as the heads of the various departments and independent establishments may prescribe.
15. The Lump Sum Leave Act, or Lane Act, of December 21, 1944 (58 Stat. 845, P. L. 525, 78th Cong., H. R. 4918), Title 5, U. S. C., provided in part:
§ 61b. Lump sum payments for accumulated or accrued annual leave upon separation from service; amount; reemployment in service; payment as salary.
Whenever any civilian officer or employee of the Federal Government * * * is separated, from the service * * * he shall be paid compensation in a lump sum for all accumulated and current accrued annual or vacation leave to which he is entitled under existing law. Such lump-sum payment shall equal the compensation that such employee would have received had he remained in the service until the expiration of the period of such annual or vacation leave: Provided, That if such employee is reemployed in the Federal service or in or under the government of the District of Columbia under the same leave system prior to the expiration of the period covered by such leave payment, he shall refund to the employing agency an amount equal to the compensation covering the period between the date of reemployment and the expiration of such leave period, and the amount of leave represented by such refund shall be credited to him in the employing agency. In the case of reemployment in the Federal service the sum so refunded shall be covered into the Treasury as “Miscellaneous Keceipts,” and in case of reemployment in or under the government of the District of Columbia the sum so refunded shall be covered into the Treasury to the credit of the District of Columbia: Provided further. That the lump-sum payment authorized in this section shall not be regarded, *655 except for purposes of taxation, as salary or compensation and shall not be subject to retirement deductions.
§ 61d. Lump sum payment for accumulated or accrued annual leave upon transfer to agencies operating under different leave systems; amount; payment as compensation.
All accumulated and current accrued leave shall be liquidated by a lump-sum payment to any civilian officer or employee of the Federal Government or the government of the District of Columbia in cases involving transfer to agencies under different leave systems. Such lump-sum payment shall equal the compensation that such employee would have received had he not been transferred until the expiration of the period of such leave: Provided, That the lump-sum payment authorized in this section shall not be regarded, except for purposes of taxation, as salary or compensation and shall not be subject to retirement deductions.
16. a. The Comptroller General had interpreted the Lump Sum Leave Act on several occasions. In 26 Comp. Gen. 259, No. B-60657, October 24, 1946, the Secretary of War is reported to have advised the Comptroller General that two employees were effectively separated from War Service positions by reduction in force on Friday, August 9,1946, and were reappointed by the War Assets Administration on Monday, August 12, 1946, in temporary positions. In one case it was known that the employee was to be reemployed but not in the other. The Secretary stated “in these cases there were actual separations from the service and temporary appointments to the new positions.” The Comptroller stated:
* * * Eeading that act as a whole, it is apparent that it was the intent of the Congress to authorize a lump-sum payment in every situation in which an employee otherwise might be compelled to forfeit the leave which had accrued to his credit, and, also, to require — if the employee during the period over which the lump-sum payment was computed were reemployed in a position in which such leave again might be credited to him — a refund of an amount equal to the compensation' covering the period between the date of reemployment and the expiration of the leave period. * * *
*656 While the grant of annual leave both to permanent employees and to temporary employees is contained in the same statute, it will be noted that those temporary employees who are entitled to leave are entitled to 2% days’ leave for each month of service, whereas other employees covered by the section are entitled to 26 calendar days’ leave a year, or at the rate of approximately 2% days per calendar month. Also, it will be noted that temporary employees are entitled to leave on a monthly service basis whereas permanent employees are entitled to leave on the basis of the calendar year. Hence, while, as stated above, these two formulas for crediting leave are contained in the same act, it clearly appears that each forms the basis of a separate leave system, one system for temporary employees and one system for permanent employees. Accordingly, in that view, an employee appointed, reappointed, or transferred without a break in service from a permanent position to a temporary position may be regarded as transferring to a position under a “different leave system,” within the meaning of that phrase as used in section 3 of the lump-sum leave payment act of 1944, and as entitled to a lump-sum payment computed as of the last day of his service in the permanent position. * * *
b. In 26 Comp. Gen. 786, No. B-64710, April 15, 1947, the Secretary of Interior advised the Comptroller General as follows:
A number of employees of the Bureau of Mines were given temporary appointments limited to definite periods of time not to exceed one year under Civil Service Regulation 8, Section 4. It is now planned to terminate these appointments and reappoint the same employees under Civil Service Regulation 8, Section 2, which provides that appointments under this regulation shall be temporary in nature but since such appointments are not limited to definite periods of time, appointees shall be subject to the provisions of the leave regulations which pertain to permanent employees.
The Comptroller stated that Regulation 8, Section 4, authorized “job employment” of a temporary character under appointments limited to not to exceed six months and such employees were “temporary” for leave purposes. The Comptroller further stated that Section 2 of Regulation 8 provided for temporary appointments “pending the establishment of a register” and without further time limitation and that such *657 employees were “permanent” for leave purposes.. Consequently be ruled that “upon transfer of an employee between positions covered by those sections, a lump-sum payment for the unused annual leave at the date of transfer is required.”
c. In 27 Comp. Gen. 41, No. B-67117, July 10, 1947, the Librarian of Congress wrote the Comptroller General and inquired if transfer from permanent to temporary appointments was covered by 26 Comp. Gen. 259 and if lump-sum payments were mandatory. The Comptroller ruled—
It is settled that the permanent or temporary character of a position for leave purposes under the annual and sick leave acts of March 14, 1936, 49 Stat. 1161, 1162, is determined by the terms of the appointment of the occupant of such position. See 22 Comp. Gen. 429, and decisions cited therein. Hence, while a position may be “permanent” for budgetary purposes yet, if the terms of the appointment of the occupant of such position are such as to bring him within the definition of “Temporary employees” as contained in the leave regulations, the position is a temporary one for leave purposes. Conversely, even though a position administratively be considered as “temporary” if the terms of the appointment of the proposed incumbent thereof be such as to bring him within the definition of “Permanent employees” as defined in the leave regulations, the position is a “permanent” position for leave purposes. Consequently, upon a change in the appointment of an employee from that of permanent to temporary, or vice versa — notwithstanding that such appointments were made to the same position — the employee, under the rule stated in the decision of October 24,1946, supra, would be entitled to a lump-sum payment for accrued and unused annual leave to his credit at the time of such change in the tenure of his appointment. Accordingly, question 1 is answered in the affirmative.
With respect to question 2, it may be stated that since, as held in the said decision of October 24,1946, the transfer of an employee from a permanent to a temporary position is a transfer to a position under a “different leave system” within the meaning of that phrase as used in section 3 of the lump-sum leave payment act of December 21, 1944, 58 Stat. 845, 846, the specific requirement contained in that section that “all accumulated and current accrued leave be liquidated by a lump-sum payment * * * in cases involving transfer to agencies under different leave systems,” makes it mandatory that, *658 in such instances, a lump-sum payment be made. For the purposes of the lump-sum payment requirement of section 8 of the said act of December 21, 1944, it is immaterial whether the transfer is from a permanent position to a temporary position or from a temporary position to a permanent position. See decision of April 15, 1947, B-64710, 26 Comp. Gen. 786. * * *
The Comptroller also held that lump-sum payments were 'mandatory.
d. Mr. Madigan and Mrs. Matteo were familiar with these decisions of the Comptroller General.
17. a. On May 27,1950 (Saturday), Madigan telephoned Mrs. Matteo to discuss the possibility of conserving anticipated fiscal 1951 appropriations by using the 1950 appropriations earmarked for terminal leave only, of which $1,800,000 was still available.
5. On Monday morning, May 29, Madigan again discussed his plan with Mrs. Matteo and also with Mr. Comfort, Director of the Budget and Finance Branch. In the afternoon, he wrote the following memorandum to them describing his proposal:
I feel I have in concrete form now the somewhat vague ideas given LAM in telephone conversation Saturday and which we discussed this forenoon.
The situation as it stands now is — RIF effective COB June 30 with active duty COB June 6, extension of notices through June 30 for 1130 employees plus as many more as additional funds will permit. This contemplates a substantial reduction of expenditures through mass leave without pay.
My views encompass no leave without pay, maximum number of employees on roll through June, maximum amount of annual leave, June 7-23, inclusive, and the fullest possible utilization of the substantial balance of the $2,600,000 appropriated for terminal leave in the fiscal year 1950.
My idea is that we should modify the outstanding RIF notices to make them effective at the close of June 25, which would give the necessary 30-day advance notice, with active duty COB June 6 as presently indicated. Extend notices through June 30 of a presently unknown number, after reserving some $200,000 for maximum June 26-30 employment on Limited Temporary appointments of necessary number, excluding those with rela- *659 lively small amounts of leave, say, 30 to 40 days, probationers, attorneys with status obtained prior to May 1, 1947, nonveteran status employees with short service, possibly the Newark office because of complications up there, etc. The majority of employees would therefore be on annual leave during the period J une 7-23 as part of the terminal leave payment to make maximum utilization of the approximately $1,800,000 available for that purpose. This would also give a large number of employees a 13-day period of annual leave at a time when business is at a low ebb in the organization, particularly in the Area offices. It would also have the advantage of removing a very substantial terminal leave obligation from the prospective 1951 situation.
The Temporary Limited appointments to be issued to provide maximum employment (active duty) June 26-30 would be converted at varying dates after July 1, beginning perhaps in September or other convenient date to tie in with simplifying reassignment program on assumption that initial 195.1 appropriation will be only for seven months.
The foregoing would also have the advantage of not utilizing the anticipated 1951 appropriation for part of the June 25-July 8 payroll.
If there are “bugs” in the foregoing and of course I am a bit apprehensive there may be, please do not hesitate to point them up — prominently.
o. On Wednesday, May 31, 1950, Madigan addressed the following memorandum to Mr. Woods, the Housing Expediter:
You will recall that Monday morning when you stopped in with Ed on your way to see Representative Thomas I indicated certain possibilities had occurred to me in connection with our financial situation and that I was trying them out on Linda Matteo and Bill Comfort. Further consideration indicates the possibility of “pulling ourselves up by the boot straps,” and the matter is presented for your consideration before proceeding to button it up.
The situation as it stands now is — RIF effective COB June 30 with active duty COB June 6; extension of Notices through June 30 for approximately 1130 employees plus as many more as funds will permit. This presently contemplates a substantial reduction of June expenditures through mass leave-without-pay.
My views visualize:
*660 1. Maximum utilization of 1950 funds, including Terminal Leave.
2. Maximum number of employees on annual leave during June but with 2,700-odd back on active duty June 26-30 with the probable indications of an extension of rent control.
3. Maximum annual leave June 7-23 (13 days and, incidentally, the accrual for January-June) during lull in activities.
4. No leave-without-pay during June (June 7-23 annual leave of RIFEÉS chargeable to Terminal rather than Operating funds).
5. Minimum Terminal Leave obligation in 1951 in connection with appropriation for the 7-month period — J uly-J anuary.
In order to accomplish the foregoing we would:
1. Modify outstanding RIF Notices, making them effective COB June 25, thus meeting the CSC period of required advance notice.
2. Extend Notices of a presently unknown but substantial enough number to maintain offices through June 30 after reserving necessary funds for maximum June 26-30 employment. This would include a majority of the employees under Temporary Limited appointments which can be made for up to a year, the initial appointment to be for three months with an extension of three months, which can be made without recourse to the CSC. The normal extensions from June 6 would include minimum number of bey officials of both Departmental and Field service, of qualified employees with the relative smaller amounts of annual leave (30 to 40 days), probationers, non-veteran status employees with short service, attorneys with status acquired prior to May 1, 1947, and any special situations.
3. Carry through on outstanding RIF for the majority in order to utilize the very substantial balance (1.8 million or more) in current appropriation earmarked for Terminal Leave only.
Among other advantages this proposal would provide for a considerable volume of annual leave at a time when the agency’s activities are at low ebb, obviating the necessity for substantial grants of annual leave during the first few months under new legislation when activities would be greatly stepped-up. Also, it would lessen the terrific impact of our huge volume of accumulated and accrued annual leave in connection with the 1951 requirements *661 whicli, conceivably, could include actual liquidation activities during the final months of the fiscal year 1951.
The Temporary Limited appointments to be issued to provide maximum employment (active duty) June 26-30 on basis of continuing activities would be converted at varying dates after July 1, 1950, beginning perhaps in September to tie in with simplifying our reassignment program, particularly on basis of present indications of an initial 1951 appropriation for only 7 months. Also, the proposed plans would have the advantage of not considering utilization of the anticipated 1951 appropriation for a portion of the June 25-July 8 payroll.
Please give this submission your early consideration and let me have your reaction in order that necessary arrangements might be perfected.
d. On Thursday morning, June 1, the Madigan proposal was thoroughly discussed at an OHE staff meeting called by Barr at Woods’ direction and attended by Messrs. Barr, Madigan, Diggle, McCarthy, Dupree, and O’Brien, the principal officers of the agency. That afternoon Madigan sent a memorandum to those who attended the conference that morning, in which he described his proposal in virtual repetition of his May 31 memorandum to Mr. Woods (finding 17 c, supra).
18. On June 1, 1950, Mr. Barr, General Manager of OHE, wrote the following memorandum to the Housing Expediter, Mr. Woods, summarizing the June 1 staff meeting referred to in finding 17d, supra, and giving his adverse views to the Madigan proposal:
The entire meeting was devoted to a discussion of the current budget problem. The General Manager reviewed the events that have taken place prior to today’s meeting concerning various approaches to the situation.
He stated that the Housing Expediter had received tacit approval of a plan to have all employees take one week’s leave without pay from Representatives Cannon, Thomas and McGrath of the House Appropriations Committee and Senators Hayden and Maybank of the Senate Appropriations Committee. In view of these agreements the Expediter had, as of the afternoon of Wednesday, May 31st, decided to put this plan into effect. This would require the extension of all RIF notices now in effect from the present June 6th termination of active duty to June 30th and the Area Rent Di *662 rectors throughout the country would have all employees stagger their leave-without-pay periods during the weeks of June 12th and June 19th. Messrs. Woods, Dupree, Barr and Madigan were informally, discussing the mechanics of putting such a program into effect when Mr. Madigan stated that possibly there was a third alternative. To date there had been only two suggestions — that is, the one week’s leave without pay plan, and the reduction of approximately 1,640 employees effective June 6th. Mr. Madigan presented this plan to the Housing Expediter who took it under consideration and Mr. Madigan, at the suggestion of the. General Manager, presented his plan to the Staff Committee during the course of the meeting.
The plan contemplates placing on terminal leave approximately 1,640 employees during the period June 6th through June 25 th. It further contemplates the. amending of present notices from a June 30th expiration date to June 25th. The 1,640 employees would receive lump sum terminal leave payments and would possibly be eligible for re-employment in the agency on a temporary limited basis on June 26th, pending the prospects of rent control legislation and appropriation at that time.
The plan was discussed in considerable detail by all members of the Committee and the General Manager made the statement that in his opinion there was no difference between this plan and the original plan to cut 1,640 employees off the payroll with the exception that this plan contemplates a possibility that some or all of them would be rehired on June 26th on a temporary limited basis. This statement was not contested.
The General Manager outlined the following objections to this proposal:
1) It is discriminatory in that it would place within the power of someone in the agency the duty of deciding which employees would be placed on terminal leave and which employees would remain on active duty. It would be impossible to make this decision by following the retention register because many key officials would have to be kept who do not stand in a favorable position on the register. Even if such employees were rehired on June 26th they would be hired on a temporary limited basis and would not have reassignment rights in any future EIF program that might be necessitated by the 1951 appropriation.
2) Because the plan is identical to the original suggestion that the agency reduce its staff by approxi *663 mately 1,640 employees, it would play into, tbe hands of our opponents who have followed an obvious course of action that the truly effective way of ending rent control is by appropriation..
3) This plan would require the spending of 1950 terminal leave funds prior to July 1 and as a result would be more expensive to the government in that if all employees were kept after July 1 the new provision in the omnibus budget bill requires that employees may not gain financial reimbursement for leave accrued during the calendar year 1950 but under this plan they would receive such reimbursement.
4) The Expediter could be severely criticized for rehiring some 1,640 people on June 26th — four, days before the expiration of the present Act, when in all probability final legislation will not be passed by the Congress by that time and certainly there will be no action on the 1951 appropriation. Should the Expediter fail to rehire these employees prior to July 1 there is a definite possibility that his staff could never be substantially increased because of the present provision pending before the Congress which provides that no agency may increase their employment roster by more than 10% of the positions which may become vacant during the fiscal year beginning July 1,1950.
5) It would agitate the temper of Congress in that such a proposal could be construed as a direct violation of their intent in the use of 1950 terminal leave funds.
• 6) The Expediter has already received tacit approval from key members of the Appropriation Committees on his one week’s leave-without-pay plan, and to take an opposite course of action at this time would prove embarrassing.
Statements in favor of the plan are as follows:
1) No employees in the agency would be required to take leave without pay.
2) The plan would enable employees to receive lump sum payments for all leave, including leave accrued during the year 1950, rather than being required to take any leave accrued during 1950.
3) The plan does not contemplate the use of 1951 funds for personal services acquired during the last week of the 1950 fiscal year.
4) Other arguments in favor of this proposal are contained in Mr. Madigan’s memorandum to the Housing Expediter of May 31, copies of which have *664 been distributed to members of the Staff Committee. The Committee recognizes that all statements made pro and con concerning this issue have not been substantiated or completely investigated, but it was agreed that such questions would be answered completely before a final decision is made by the Housing Expediter.
Copies of the above memorandum were distributed to Messrs. Dupree, Madigan, O’Brien, Diggle, and McCarthy.
19. a. On June 2,1950, Madigan sent the following memorandum to Barr countering the comments by Barr in the latter’s memorandum of June 1 (finding 18):
I just don’t want to disappoint you by not commenting on your Summary of the June 1 staff meeting, so:
I do not understand “would possibly be eligible for reemployment in the agency on a temporary limited basis on June 26” in the statement indicating “the 1,640 employees would receive lump sum terminal leave payments * *
Contested or not contested, I undertook to explain that the recent proposal was substantially the same as the outstanding BIF notices up to June 26, but in no manner did I indicate that the recent proposal “contemplates a possibility that some or all of them would be rehired on June 26 on a temporary limited basis” (underscoring supplied). There was no indication of any possibility that some or all would be rehired June 26 on a temporary limited basis. The plan contemplated appointment of maximum number desired if trend of legislation on extension indicated justification therefor.
1) As to the plan being discriminatory in that it would place within the power of someone in the agency the duty of deciding which employees would be placed on terminal leave and which would remain on active duty, let me point out that that would be no more discriminatory than doing what the Begional Housing Expediters were instructed to do and have been doing — nominating their quotas of the 1100-odd employees whose current BIF notices were to be modified by extension of last day of active duty from June 6 to June 30. I fail to understand the significance of your reference to the Betention Begister since that is not involved. Further, I do not understand the reference to those employed on a temporary limited appointment not having reassignment rights in any future BIF program that might be necessitated by the *665 1951 appropriation. The employees would lose no rights and, as you will recall, the plan contemplated reinstatement to permanent appointment at convenient periods in the early months of the new fiscal year.
2) I am unable to accept the statement that the plan under discussion is identical to the original suggestion that the agency reduce its staff by approximately 1640 employees. The plan is different. Furthermore, at no time would we have fewer employees on ,our roll than on June 1 or June 6 except as resignations, transfers, or deaths created the situation.
3) Reference that the plan “would be more expensive to the Government” involves speculation on ramifications, but in any event would be a negligible item.
4) I am inclined to believe that the Housing Expediter would be complimented rather than criticized for rehiring some 1640 experienced employees on June 26 even though it would be only four days before the expiration of the present Act, even if final action had not been taken on pending legislation, but with indications of the probable trend as a result of House consideration and action prior to June 26.
5) I differ with your views concerning agitating the temper of the Congress with reference to full utilization of an available appropriation for the payment of current terminal leave which would, in fact, be entirely proper in the circumstances under which we are now operating.
6) I see no reason why the Housing Expediter should be embarrassed in any way if a plan other than the one informally discussed with key members of the Appropriations Committees for which tacit approval has been obtained should be followed in the interests of both the organization and its personnel. In connection with the statements in favor of the plan,
I doubt that you state in the second item what you intended to state. The plan would not enable employees to receive lump sum payments for all leave, including leave accrued during the year 1950, rather than being required to take any leave accrued during 1950. Obviously, the second half of the year 1950 is not involved in the fiscal possibilities for the period ending June 25.
In accordance with indications given yesterday, I attach specific information concerning specific questions raised during our discussion yesterday in order that the Housing Expediter and all concerned may be completely and accurately informed in the matter.
*666 b. Madigan’s June 2 memorandum to Barr had attached to it a summary of advantages and disadvantages of the plan, reading in part as follows :
RETENTION RIGHTS AND NATURE OF APPOINTMENT

Advantages:

1. RIF reassignment rights will be retained, including DCE rights, since CSC regulations provide that acceptance of limited temporary appointments will not nullify retention rights.
2. As soon as practical, reinstatement action will be taken to restore original category on register.
3. Although some employees have a fear of reinstatement as being an involved procedure, actually, reinstatement is one of the simpler processes as long as a person has reinstatement eligibility.

Disadvantages:

None.
ANNUAL LEAVE

Advantages:

jJ« tfi $ $
2. Upon reinstatement, lump sum terminal leave payment will be made for all annual leave accumulated under the temporary limited appointment. Leave accruals will begin under the permanent appointment rate of 4 hours per week from the date of reinstatement.
3. A large leave accumulation is often a detriment to an employee seeking employment with other Federal Agencies that may be reluctant to assume the obligation.
4. Accumulation of leave under Temporary Limited Appointment is at a rate greater than that of the permanent system — under a 90-day appointment an [sic] usually actual accrual gain of one day’s pay.

Disadvantages:

1. A full unbroken service month must be completed before any accrual is allowed.
2. Under the temporary limited leave system no annual leave can be taken the first 30 days nor can leave be taken subsequent thereto in amounts greater than the accumulated balances without break in service and loss of leave accrual.
3. Any absence before leave has been credited is leave-without-pay.
*667 4. Any break in service requires the establishment of a new “service month” after return to duty.
SICK LEAVE
*

Advantages:

1. Eeceiving cash for terminal leave accumulation and
the privilege of using the cash or deciding to continue to save it. .
2. Eeceiving payment for leave which might otherwise be lost by Congressional action, or having an excess at the end of the year over the established ceiling.
3. Protection of the value of leave accumulation that would be reduced upon reemployment at a lower grade or salary.
4. For those employees now carrying a leave maximum, the privilege of full payment for accumulation and the opportunity of building up new leave accumulation without the yearly cut-back.
5. Dual payment for holidays falling within the period of terminal leave and employment.

Disadvantages:

1. By the liquidation of accumulated leave balances, the value of the leave cannot further increase because of promotion or periodic pay increases.
2. Time served on temporary limited appointments would not be counted toward periodic pay increases. (Time served both before and after the temporary limited period would be counted, so delay in most cases would be less than four months and negligible in dollars and cents.)
3. No leave on leave is earned on the lump sum payment.
ADVANTAGES (IN ADDITION TO THE FINANCIAL ADVANTAGE TO THE AGENCT)
1. Eetirement retained and not affected in any way, since there will be no break in service.
2. EIF reassignment rights will be retained, including DCE rights, since CSC regulations provide that acceptance of limited temporary appointments will not nullify retention rights.
3. Hiring agencies often refuse appointments to persons with large leave credits as they do not care to absorb excessive leave. They usually prefer to give limited temporary appointments until the leave is used up.
*668 4. Although some employees have a fear of reinstatement as being an involved procedure, actually, reinstatement is one of the simpler processes as long as a person has reinstatement eligibility.
5. Payment for leave which might otherwise be lost, by Congressional action, or having an excess at the end of the year over the established ceiling.
DISADVANTAGES
1. Time served on limited temporary appointments would not be counted toward periodic pay increases. (Time served both before and after the limited temporary period would be counted, so delay in most cases would be less than four months and negligible in dollars and cents.)
2. No leave is earned until 30 days continuous service is rendered.
3. No leave on leave is earned on the lump sum payment.
PLAN X would NOT BE RECOMMENDED FOR THE FOLLOWING CATEGORIES OF EMPLOYEES :
a. Employees who have not completed their probationary periods.
b. Attorneys in competitive positions with competitive status.
c. Non-status, non-veteran employees.
d. Status employees who have not qualified in written tests for positions they are now holding, if service in Clerk, Clerk-Typist, or Steno. jobs.
e. Non-veterans in positions restricted to veterans (messengers, etc.)
f. Non-veterans with less than 2 years of service.
The disadvantages to the above types of employees are:
1. For attorneys — loss of rights to transfer, if in competitive positions with civil service status.
2. If non-status, non-veteran, we would be unable to rehire following a termination of present type of appointment. (This does not apply to attorneys.)
3. Non-veterans with less than two years of service have reinstatement rights for 1 year only.
4. Written examination might be required prior to reinstatement if Steno., Typist, or Clerk.
20. a. Mr. Woods returned to his office about noon Friday, June 2,1950. Madigan again brought up his plan. Woods *669 pointed out that Madigan’s plan was complicated and there was insufficient time to properly advise field installations by the proposed effective date of June 7th, and Woods decided Madigan’s plan would not be adopted generally.
1>. Mr. Woods did not inquire as to whether the plan had been approved by the General Accounting Office or Civil Service Commission and Madigan did not suggest this. Madigan relied on his own and Mrs. Matteo’s interpretation of the General Accounting Office decisions and the Civil Service Commission regulations. The General Counsel, whose knowledge of personnel regulations was remarkably deficient, was not asked for advice regarding legality of the Madigan plan but as a member of the Staff Committee was informed of the plan.
21. a. Woods probably had not completely assimilated the details of the Madigan plan because his time and attention were preoccupied with legislative activities. He relied upon advice of his subordinates in matters of agency housekeeping, and only when it came to disagreements in his immediate staff would he decide the result. In the matter of the Madigan plan it is doubtful if Woods comprehended more than its general nature, even though he had ample opportunity to familiarize himself with the details as they were presented in the opposing memoranda of Messrs. Barr and Madigan set forth in the preceding findings.
b. About June 5 or 6, 1950, Mrs. Matteo informed Woods verbally that 20 or 30 applications had been received from OHE employees who wished to participate in the Madigan plan, and that she expected there to be a total of about 100 applicants. Belying on assurances by his subordinates that the plan was legal, Woods told Mrs. Matteo that the plan was too complicated for general application to the agency, but that he saw no objection to participation in it by OHE employees on a voluntary basis.
22. At least one factor inducing Woods’ approval of the Madigan plan on a limited scale was the personal request of Dupree, OHE General Counsel, for permission to participate in the plan because he wanted to use his lump-sum terminal leave payment to make a down payment on a house. Woods, although possibly deficient in applying himself to *670 an understanding and supervision of personnel matters in the agency, was extremely capable in securing the cooperation and loyalty of all of his subordinates, establishing a personal interest in their welfare. In his reaction to requests by his subordinates to come under the Madigan plan he was influenced, as in the case of Dupree, by personal situations and by an underlying feeling that Government employees were entitled to be paid for any accruals of unused annual leave, without stopping to study the limitations imposed by statute or regulations, as to which he relied upon advice of those he trusted. Dupree’s request was granted.
23. Prior to June 30, 1950, plaintiff elected to participate in the plan and received an amendment to his notice of reduction in force signed by himself as Deputy Housing Expediter (Administration), which changed the effective date of his proposed separation from June 30, 1950, to June 25, 1950.
24. a. Earlier, when Madigan’s plan was first proposed, Mrs. Matteo asked the OHE Certifying Officer, Miss Sophie Donine, what the payroll status of a “riffed” employee who accepted a temporary appointment would be. Miss Donine was of the opinion that a terminal leave payment was mandatory as temporary appointments came under a different leave system. However, Miss Donine asked a General Accounting Office Auditor, Miss Ganaway (who happened to be in OHE auditing terminal leave payments made by OHE field certifying officers to employees separated in 1949 and early 1950), what the General Accounting Office’s attitude would be with respect to a “riffed” employee who accepted a 30- or 60-day appointment.[3] Miss Ganaway said she saw no reason for an exception but that she was not allowed to give opinions and recommended that her office be called for a definite decision. Miss Donine was the OHE authority on such matters and she did not seek the views of the OHE General Counsel, who was unfamiliar with personnel pro *671 cedures and regulations. A week or ten days after talking to Miss Ganaway, Miss Donine also called a lady whom she thought was Chief of the General Accounting Office audit section and was told that, if employees were going into a different leave system, she could see no reason for excepting to terminal leave payments.
b. Miss Donine started to process the employees being paid accumulated leave in cash about the second week of June, the payroll procedures for lump-sum payments being very involved.
25. Some time between June 15 and 25 Barr learned that Madigan’s plan was being used by a limited number of employees in the National Office and made vigorous objections to Woods who instructed him to devote his efforts to administering rent control legislation. However, Barr instructed his immediate staff not to participate in the plan.
26. The Housing and Bent Act of 1950, approved June 23, 1950, extended rent control from June 30,1950, to December 31,1950, except that: (a) Controls could be continued in effect to the close of June 30,1951, in any areas which voted for it; (b) All controls would be terminated immediately in areas which voted for termination, and (e) All controls could be extended at any time by proclamation of the President or by a concurrent resolution of the two Houses of Congress.
27. On June 26,1950, Monday, notices of separation effective at the close of business June 25,1950, Sunday, were issued to 49 employees, including plaintiff, who were at the same time given “temporary appointments” in their identical positions. They were paid $86,260.88 ($100,971.71 less $14,710.83 withheld for taxes), which was charged to the 1950 terminal leave fund. In addition to Madigan and Mrs. Matteo, the employees paid included the General Counsel, the Director of the Budget and Finance Branch, the National Board Coordinator, the Deputy Housing Expediter (Operations), the Assistant Deputy Housing Expediter (Operations), the Director, Statistics and Analysis Branch, the Certifying Officer, and several field officials to whom Madigan had written.
28. a. On June 26,1950, Monday, Mrs. Matteo, as Director of Personnel, issued a “Notification of Personnel Action” to *672 Madigan stating be was separated effective at tbe close of business June 25, 1950, Sunday, as Deputy Housing Expediter (Administration), pursuant to tbe reduction in force notice issued May 26, and that he was to be paid “807 hours accrued terminal leave through 7 hours on 11-15-50.” Mad-igan’s gross payment was $4,254.91 and the net lump-sum payment (after tax withholding) was $3,624.58. On the same date and in the same manner Madigan was issued a “Temporary Appointment” in the same position for not to exceed September 30, 1950. This was done under the purported authority of Civil Service Commission Regulations 2.114b and 2.114b (3) .[4] On the same date Madigan also executed an “Appointment Affidavit,” Standard Form 61 of the Civil Service Commission, before the OHE Appointment Clerk. No demand was made of Madigan at this time for a refund of any of the terminal leave payment he had received.
b. Also, on June 26, 1950, in the same manner, and under the purported authority of the same regulations, Mrs. Matteo separated and reappointed herself as Director, Personnel Branch, with payment for “437 hours accrued terminal leave through 5 hours on 9-12-50.” The gross lump-sum payment therefor was $1,916.19 and the net lump-sum payment (after tax withholding) was $1,644.37.
c. On June 27, 1950 (Tuesday), the day after his separation from permanent status, Madigan wrote Woods that *673 OHE was “officered” to administer a considerably larger force than it was likely to have “even the total of 2700” informally discussed the preceding week. On June 30,1950, Madigan also wrote Woods that OHE personnel bad declined from 2,778 on May 12 to 2,656 on June 23, and bad dropped 25 in the last two weeks of that period. He stated—
Aside from the offices where employment is lessened as a result of decontrol, local or state, we will doubtless have to recruit. In any event if there is not a need for replacements at some points it will give us some probably desired leeway in connection with the probable limitation of 2700 the Budget Bureau will impose.
d. At this time federal rent controls were still in effect on approximately 8,000,000 dwelling units occupied by approximately 28,000,000 people in 40 states and 3,400 incorporated cities, towns, and villages, and Congress had extended rent controls from December 31, 1950, to June 30, 1951, if decontrols were locally opposed.
29. a. During the two weeks ending June 24, 1950, OHE employees took five days’ leave without pay, and the normal payroll of $425,813.02 was cut to $213,162.91.
&. Public Law 583, 81st Congress, The Deficiency Appropriation Act, 1950, H. It. 8567, which was introduced May 19, 1950, passed the Congress June 27 and was approved June 29,1950. This made an additional $600,000 for salaries and expenses available to OHE for the period through June 30, 1950.[5]
30. House Joint Kesolution 492, approved June 29, 1950, Public Law 585, 81st Congress, made temporary appropriations for the fiscal year 1951 available to Government departments and agencies to the extent and in the manner provided in the General Appropriations Act, 1951, as passed by the House of Representatives May 10, 1950, which included the Thomas amendment (finding 4). Subject to the provisions of the Act, appropriations for the Office of the Housing Expediter were for:
*674 Such amounts as may be necessary for carrying out, at a rate for operations, exclusive of terminal leave, not in excess of that which obtained in the last quarter of the fiscal year 1950, * * *.
31. a. The President submitted appropriation estimates for OHE to the Speaker of the House of Representatives July 12, 1950. On July 14, 1950, the Housing Expediter requested the House Appropriations Committee to approve appropriations of $13,395,000 for the fiscal year 1951, and $605,000 for 1952, stating he expected only a slight amount of decontrol by December 31, 1950, to gradually reduce his staff for nine months, to drastically cut it the last three months, and to liquidate OHE in 1952.
b. By House Joint Resolution 512, approved July 31,1950, P. L. 627, 81st Congress, the funds appropriated by Public Law 585 (finding 30) were continued available to OHE. By House Joint Resolution 537, approved September 2, 1950, funds were made available as provided by the Supplemental Appropriation Act as passed by the House of Representatives August 26,1950,[6] until September 30, or passage of the Supplemental Appropriation Act, whichever was sooner. The Supplemental Appropriation Act, 1951, Public Law 843, H. R. 9526, 81st Congress, was approved September 27,1950, and appropriated to OHE for salaries and expenses $10,615,500, together with not exceeding $1,600,000 of the unobligated balance of funds appropriated for such purpose for the fiscal year 1950, of which “not less than $2,000,000 shall be available only for payment of terminal leave.”[7] The Act also contained the Whitten Amendment as follows:
Seo. 1302. After September 1, 1950, and during the fiscal year 1951:
*675 (a) In making appointments in the Government service the Civil Service Commission shall make full use of its authority to make temporary appointments in order to prevent increases in the number of permanent personnel and no employee in the Federal civil service promoted, transferred or appointed to a position of higher grade shall be eligible, in the event of separation from the service through reduction in force, to reinstatement at a grade above the grade held by such employee on September 1, 1950; and all reinstatements, transfers or promotions to positions in the Federal civil service shall be temporary and for positions subject to the Classification Act of 1949 shall be made with the condition and notice to the individual reinstated, transferred or promoted that the classification grade or the position is subject to post-audit and correction by the appropriate departmental or agency personnel office or the Civil Service Commission; * * *.
32. a. Under date of July 29, 1950, Madigan, as Deputy Housing Expediter (Administration), issued to himself and Mrs. Matteo a “notice of separation because of Reduction in-force” “as a result of curtailment of operations” with active duty status terminating August 31, 1950. However, under date of August 28,1950, Madigan amended the notices to “show your last date of active duty as September 29,1950.” The record does not support the fact that operations were actually being curtailed, especially with regard to these key employees. An administrative memorandum prepared by Madigan shows that the organization and roster of the National Office between July 1, 1950, and April 15, 1951, continued with substantially the same division heads and principal employees and the number of employees increased from 269 to 314.
5. Under date of September 27, 1950, the Acting Deputy Housing Expediter (Administration), Mr. G. William Comfort, who also participated in the plan, issued notices to Madigan and Mrs. Matteo canceling their July 29, 1950, RIFs. Under date of September 29, 1950 (by which time the Supplemental Appropriation Act, 1951, had passed), the Acting Director of the Personnel Branch issued purported requests for personnel actions and notifications of personnel actions whereby temporary appointments were made effective October 1,1950, for not to exceed November 26,1950, in *676 the case of Mr. Madigan, and December 31, 1950, for Mrs. Matteo, the stated authority being Civil Service Regulation 2.114(b) (3),above.
33. By Departmental Circular No. 641, dated October 2, 1950, the Civil Service Commission notified the heads of Departments and Independent Establishments of the Whit-ten Amendment, section 1302 of the Supplemental Appropriation Act, 1951 (finding 31), and of changes necessitated thereby, stating in part:
B. Reinstatements
In accordance with the requirements of the Act all reinstatements of persons with civil service status beginning September 2, 1950, must be made on a temporary basis. Accordingly, in all cases, persons with competitive status must be given emergency indefinite appointments under section 2.114 (h) of the Civil Service Regulations. However appointing officers may make such appointments in lieu of reinstatement, thereby bringing such persons within the provisions of the Civil Service Retirement Act.
When such appointments are in lieu of reinstatement they shall be reported as “temporary appointment (emerg. indef. in lieu of reinstatement) NTE 6/30/52.” In such cases the appointees are under the civil service retirement system. When such appointments are not in lieu of reinstatement they shall be reported as “temporary appointment (emerg. indef. — competitive status) NTE 6/30/52.” In such cases the appointees are not under the civil service retirement system. The authority box shall show “Civil Service Reg. 2.114 (h).”
The circular made the foregoing provision retroactive to September 2,1950.
34. Under date of October 25, 1950, a “Notification of Personnel Action,” executed by G. William Comfort as Acting Deputy Housing Expediter (Administration), terminated Mrs. Matteo’s “Temporary Limited Appointment” and made a noncompetitive “Conversion to Reinstatement” effective October 26, 1950, assigning as authority therefor Civil Service Commission Regulation 7.104. Payment was made in a lump sum for accrued terminal leave, which amounted to $275.97 ($338.40 gross less $62.43 withheld for taxes).
*677 35. a. Under date of November 13,1950, the Civil Service Commission issued further instructions to all Government agencies by its Transmittal Sheet No. 316, revising the Federal Personnel Manual, and amending the Commission’s regulations to effectuate the Whitten Amendment, section 1302 of the Supplemental Appropriation Act, 1951. The instructions stated:
* * * Parts 7 and 8, dealing with noncompetitive selection of former and present employees, have been completely rewritten; Part 7 now covers employees who will have no claim to permanent jobs upon termination of their indefinite appointments, * * *.
If, in the case of reinstatements, * * * effected after September 1, 1950, the employees were not notified of the temporary limitation on such actions as required by section 1302 of the Supplemental Appropriation Act, 1951, they should now be so notified in writing. * * *.
5. Part 7 of Transmittal Sheet No. 316, issued November 13,1950, related to the appointment of employees of other agencies without reemployment rights and of former federal employees. It provided:
Sec. 7.104 Agency authority for reinstatement. Suspended effective December 1,1950.
Sec. 7.105 Agency authority and general requirements. (a) After September 1, 1950, the employment noncompetitively * * * of former Federal employees shall be by indefinite appointment only. * * *
36. Under date of November 24, 1950, a “Notification of Personnel Action,” executed by Mrs. Matteo as Director of the Personnel Branch, terminated plaintiff’s Temporary Limited Appointment and effected a Conversion to Bein-statement on a permanent basis effective at the close of business November 25, 1950, with any accrued terminal leave to be paid in a lump sum. Kegulation 7.104 was assigned as the authority therefor, and plaintiff was paid $339.15 ($413.60 gross less $74.45 withheld for taxes). No refund was made of any part of this terminal leave payment at that time.
37. Each personnel action referred to in findings 28 a, 28 b, 32, 34, and 36 was journalized and appropriate dis *678 tribution was made to the Civil Service Commission and they were retained in the Commission files.
38. a. In the period August 31, 1950-September 26, 1950 an inspector of the Civil Service Commission’s Inspection Division made an inspection of the OHE personnel program for the period August 1, 1949, through July 31, 1950, in which 4,432 personnel actions, including 2,375 KIFs had occurred, but made no comment in his brief report relative to the personnel actions or lump-sum leave payments here in dispute. A report dated October 16, 1950, by another inspector examining reductions in force actions from October 1,1949, to September 1,1950, stated:
It was noticed during investigation that approximately 49 status employees were terminated as of June 26 and given temporary appointments the following day. Approximately six of these employees during the months of July and early August were recommended for reinstatement. The balance of these employees are still serving temporary limited appointments.
It appears that an effort was made by the officials of the agency to follow reduction-in-force procedures in effecting separations and reassignments during the past fiscal year. An occasional error was made which the agency corrected as soon as it was informed of the violation. The agency was confronted with certain administrative difficulties which were due to the late congressional action in extending the life of the agency as well as the fact that its appropriation bill was not signed until September 27.
b. Under date of December 26, 1950, Harry B. Mitchell, Chairman, Civil Service Commission, wrote Tighe Woods, Housing Expediter, as follows:
We are enclosing for your information a copy of the inspection report covering our recent review of the personnel operations of your agency.
In general, we find compliance with regulations to have been satisfactory. In those instances where corrective action was required your representatives were cooperative in initiating such action promptly.
There was some evidence of failure to process temporary appointments in a manner prescribed by the regulations. We were not completely convinced that all provisions of the Veterans’ Preference Act had been *679 complied with in effecting the appointments, nor did we find that appropriate records of consideration were maintained in all cases so that your agency could prove in a positive fashion compliance with the regulations. No corrective action is required at the present time beyond the steps being taken by your personnel officer to improve this operation. We plan to reinspect this phase of your personnel work during the month of February 1951. We realize, of course, the administrative difficulties with which your agency has been faced due to the late congressional action extending the life of the agency and the lateness in receiving appropriations for your operation.
We appreciate very much the cooperation of your representatives during tiffs inspection.
c. The Chairman of the Civil Service Commission wrote the following letter, dated May 16,1951, to Tighe Woods with respect to a subsequent examination of CHE:
We are very glad to be able to inform you that a rein-spection of your application files recently conducted by a member of the Commission’s Inspection Division indicates these files are now excellently organized and appointments being made are completely in accord with the Commission’s requirements. We appreciate the action that has been taken in correcting the situation noted in our previous inspection.
39. In August of 1951, auditors of the General Accounting Office made an on-the-site audit of the payrolls of the Office of Rent Stabilization, at which time the lump sum payments referred to in findings 27, 28, 34, and 36 were specifically called to their attention. At this time Miss Donine spoke with Mr. McManus’ supervisor, Mr. L. C. Tredway, of the General Accounting Office, and gave him full details concerning the payments. Mr. McManus prepared a memorandum of the facts addressed to Mr. H. H. Sasscer, auditor-in-charge, General Accounting Office, dated August 29, 1951. This memorandum was prepared for the signature of Mr. Tredway. The memorandum was taken to the office of Mr. Sasscer and discussed with him and Mr. Wineberg, Zone Audit Chief, on September 3, 1951. • It was decided at the conference that in view of the 1946 and 1949 decisions of the Comptroller General, referred to in finding 16, no report *680 would be made to the Comptroller General’s Office at that time, but an “informal exception” would issue to see what explanation the administrative office could offer. Mr. Mc-Manus issued an “informal exception” on September 12,1951, against the lump-sum payment made to Mr. Edwin Dupree. Jr., but before any reply was made, the 1951 Annual and Sick Leave Act was approved and, since the practice to which exception was taken could no longer occur, Mr. Tredway advised Miss Donine, in response to a telephone call from her, that no reply to the informal exception was necessary.
40. The act of December 20,1950, section 1, extended rent control from December 31,1950, to March 31," 1951, and subsequent acts extended controls to July 31, 1953. Executive Order No. 10276, signed July 31, 1951, provided for the liquidation of the Office of Housing Expediter and transferred its rent control functions to the Economic Stabilization Agency, which had been created on September 9, 1950, by Executive Order No. 10161. Economic Stabilization Order No. 9, signed July 31, 1951, established the Office of Eent Stabilization in the Economic Stabilization Agency and transferred the rent control functions of the Office of Housing Expediter to the Office of Kent Stabilization. Madigan became Deputy Director of Kent Stabilization (Administration) .
41. The Director of Kent Stabilization, Mr. Henderson, submitted his resignation January 13, 1953. The ESA Administrator accepted it January 31, effective at the opening of business February 9,1953, and appointed William G. Barr as Acting Director of Kent Stabilization, effective February 9. The Director of Defense Mobilization was ex óffieio head of ESA by Executive Order No. 10433, dated February 4, 1953.
42. On January 13, 1953, plaintiff prepared a memorandum addressed to National Office Officials and Kegional Directors, explaining and justifying the 1950 leave transactions, because he stated there were recurring references to that plan as a “sub rosa” deal for a favored few, which he denied, although “Substantial vigorous opposition to it developed in one quarter for reasons not then or since understood.”
*681 43. On January 28, 1953, Honorable John J. Williams, United States Senator from Delaware, wrote the Director of Rent Stabilization and requested information relative to the lump sum leave payments in question. Senator Williams followed up his letter of January 28 by telephone and talked to plaintiff about the transactions on February 2,1953. On February 3,1953, a reply to Senator Williams was prepared by plaintiff, and in Barr’s absence signed in his name as Acting Director by Mr. Henderson’s secretary. Therein, the 1950 and 1951 Appropriation Acts were detailed and the transactions commented upon. The letter made no mention of the extension of the Housing and Rent Act, approved June 23,1950, and Barr regarded the letter as a defense of the plan and quite contrary to his own views. The letter stated in part:
* * * A number of employees let their reduction in force become effective at the close of June 25,1950, and were paid in lump sum for the accumulated leave to their credit at that time. Thereafter these employees were given temporary appointments for stated periods under authority of the then Civil Service Commission Regulations 2.114 (b) (3) and 6.101 (d). At various dates the reinstatement eligibles received conversion-to-reinstatement appointments.[8]
* ifc # ❖ #
The total of the lump-sum payments to the 49 employees included in the attached list amounted to $86,260.88.
On February 4,1953, another letter to Senator Williams was prepared by plaintiff and executed by Barr containing the name, title, grade, and salary of the 49 employees. The same day Senator Williams and other Senators denounced in the Senate the practices followed in paying the accumulated leave to the 49 OHE employees.
44. On February 5,1953, Barr, as Acting Director of Rent Stabilization, wrote Senator McCarthy, Chairman of the Committee on Government Operations, Senator Everett Dirksen, who had denounced the actions, Congressman John Phillips, Chairman of the Subcommittee on Independent *682 Offices of the House Appropriations Committee, and Congressman Albert Thomas of his views and willingness to appear and explain his position.[9]
45. a. On February 5, 1953, Barr, as Acting Director of the Office of Bent Stabilization wrote plaintiff that his appointment as Acting Director would become effective at the opening of business February 9 and that he then intended to suspend him, stating:
The ground for this action is your activity, in the spring of 1950, in connection with the device whereby a number of employees of the Office of the Housing Expediter were permitted to be separated from employment and paid their accumulated annual leave credit in cash, and were thereupon immediately rehired.
While I am quite aware that this device was within the letter of the law, I was convinced at the time that it was completely contrary to the intent of those statutes which govern the appropriation of funds for federal agencies and the compensation of federal employees. As you know from our discussions since, my original view of the matter has not changed.[10]
As Deputy Housing Expediter (Administration) in 1950, and as Deputy Director for Administration at present, you have not merely been responsible for assuring that payments are made in a manner that is legally sufficient, you have also been expected to provide your superiors with full information and sound advice regarding fiscal and personnel matters. Such advice must at all times be predicated upon a full understanding and appreciation of the interests of agency employees and of the welfare of the Government of the United States. The Government is an impersonal employer, but a generous one. It has been your responsibility to provide advice and policy guidance which assures that the Government is not exploited.
*683 I believe that you failed in that responsibility when you conceived the device for cash payment of leave credits, urged its adoption, and gave sanction to its use by a small minority of the agency’s employees. In my opinion, your failure in this regard disqualifies you from further useful service with this agency.
5. On February 9,1953, when Barr became Acting Director, he wrote plaintiff that he was suspended on a temporary nonpay status for 30 days commencing at the opening of business February 9, and was to be absent from duty. However, Madigan remained at his office to prepare a memorandum of his position for General Accounting Office representatives and to write his letters to the chairmen of congressional committees requesting an opportunity to be heard.
46. After receipt of Barr’s letter (footnote 9 to finding 44) the Subcommittee on Independent Offices of the Committee on Appropriations of the House of Representatives under Mr. Phillips commenced hearings on February 10, 1953, attended by representatives of the Office of Rent Stabilization, the Civil Service Commission, and the General Accounting Office. Barr testified that the personnel actions of 1950 were “unethical and not in good propriety.” At this hearing the representative of the Comptroller General advised the Committee that he could not say whether the actions in question were legal or not and that no such conclusion had yet been reached.
47. By letters dated February 12,1953, Mr. Barr as Acting Director of ORS, advised Madigan, Matteo, and Dupree that he was withdrawing and revoking the notices of their proposed suspensions dated February 5 and 9, 1953, but that he proposed to suspend them starting February 24, 1953, for a period of 30 days without pay and to place them on annual leave effective February 12, 1953. Plaintiff was advised as follows:
The basis and grounds for the action proposed is as follows:
During the months of, on or about May or June in the year of 1950, you introduced, proposed, executed, participated, and gave sanction to the use of a plan or device the purpose and design of which was to enable some *684 of tbe .employees of the Office of Housing Expediter, the predecessor agency of this agency, to secure cash payment of the accumulated annual leave to their credit without there being any real termination in their continuity of service as employees of the agency. The method as contemplated and effected by this plan or device to bring about this highly improper, irregular and unethical result was to permit such employees to be separated from their employment pursuant to then existing reduction-in-force notices, allow them to be paid their annual leave credit in cash (which in some cases, as you know or shoüld have known, amounted to considerable sums of money) and then immediately and in fact on the very next working day following the aforesaid separation, such employees were re-hired on temporary limited appointments in the same position and grade, and then at a subsequent date were converted to permanent employees, again in the same position and grade. This plan recognized and contemplated that such employees would receive further and additional cash payments of accumulated annual leave when such employees were converted to permanent status from their temporary limited employment status.
Further, as it developed, when many of such employees were reinstated to permanent positions, all pursuant to the plan, there was then in full force and effect, Section 1302, of chapter 13, of Public Law 843, 81st Congress, approved September 27,1960, more commonly known as the Whitten Amendment, which prohibited the reinstatement of employees to other than temporary positions. Nevertheless, many of the employees were permitted to be reinstated to permanent positions, contrary to the terms and provisions of said Whitten Amendment.
You were the Deputy Housing Expediter (Administration) during the above period and as such you were responsible for assuring that Government expenditure and personnel actions be made in a manner not only legally sufficient but also consistent with and not in derogation of the intent, purposes, and objectives of the applicable Congressional statutes.
_ Therefore, your connection with the said plan or device in the manner hereinbefore described, is considered to be conduct unbecoming to a Federal employee of your position and status and contrary to the best interests of the efficiency of the service.
As you know, I was convinced then, and am still convinced, that the aforesaid plan or device if not illegal *685 was nevertheless completely contrary to the intent and purpose of Congress in the enactment of those statutes governing the appropriation and payment of funds for purposes of terminal leave.
48. On February 13, 1953, the Acting Comptroller General, Frank E. Yates, wrote Barr as Acting Director and requested that any proposed lump-sum leave payments to the involved employees be transmitted to the Comptroller General’s Office for settlement.
49. On February 17, 1953, Mr. Barr wrote Mr. Lawrence Y. Meloy, Chief Law Officer, Civil Service Commission, as to the status of 25 employees converted to reinstatement after September 1, 1950, and asked the following questions as to the 1950 personnel actions resulting in lump-sum leave payments :
1. Were the reinstatements to permanent positions of the employees involved, insofar as they were made after September 1, 1950, contrary to and in violation of the terms and provisions of the Whitten Amendment?
2. In the event that it is your opinion that reinstate-ments were in violation of the YChitten Amendment, will you kindly favor us with the recommendations of the Civil Service Commission as to the proper personnel procedure (excluding disciplinary features) to be followed at this time by this agency in connection with the employees involved.
3. Were the reinstatements to permanent positions of the employees involved, regardless of when they were made, violative of the provisions of any other statutes or regulations ?
4. In the event it is your opinion that the reconversion of said employees to permanent status, whenever made, was in violation of some other statute or regulation, will you kindly advise us as to which acts or regulations were infringed and what personnel actions at this time are recommended as to said employees.
50. On February 20, 1953, Acting Comptroller General Frank L. Yates made a report, B-113811, of actions of the General Accounting Office with respect to the lump-sum leave payments, and the General Accounting Office also made a report, 1-18007, of its investigation of the lump-sum payments. The Yates report stated in part:
*686 With reference to the decision made by the audit personnel [in 1951] not to report the payments made by the Office of Rent Stabilization to the Comptroller General, I can see the reasoning for such a decision but I emphatically disagree with it. * * *
$ $ ‡ ‡
Upon review of all of the facts now disclosed in connection with the payments made for accrued leave by the Office of Rent Stabilization, there is no doubt that the shifting of employees from permanent to temporary positions and then back to permanent positions was done for the sole purpose of making payments for accrued annual leave. The appointments were not in fact bona fide. Therefore, the payments made for accrued leave as a result of the transactions were not proper. However, the full monetary result has not been completely developed at this time. If a flat position is taken that all employees should repay the amounts received in lump-sum leave payments there would necessarily have to be recredits to the employees’ leave accounts. The Government would make a collection with one hand and assume a liability with the other. In some cases the liability would have to be paid off in the near future. In the case of the Office of Rent Stabilization there is no statutory authority for its continuance beyond April 30, 1953. In some circumstances, it could result in increased cost to the Government to require a collection of the amounts paid in 1950 and 1951 and recredit an employee’s leave account and then pay for accrued leave to the employee’s credit in 60 days’ time, consideration being given to the fact that all Federal employees have received a pay increase since 1950. On the other hand, where employees were carrying close to the maximum allowable leave accumulation in 1950, it is possible that an employee would have received or be in a position to receive a larger payment for leave than he would be entitled to if the 1950 device had not been used.
The General Accounting Office is presently reconstructing the leave accounts of each of the 53 employees involved. In any case where the transaction in 1950 or 1951 resulted in an additional cost or liability to the Government, adjustment will be made (1) by collection of overpayments where employees have left the service; (2) by reduction of terminal leave payments upon separation of those employees still employed by the Office of Rent Stabilization; or (3) in cases of employees who have transferred or may transfer to other agencies by *687 notifying the agencies to which transferred to adjust the employee’s leave account.
51. On February 19, 1953, both Madigan and Matteo responded to Barr’s notice of February 12 (finding 47) denying the charges, pointing out the failure of the notice to advise them of their right to an administrative hearing, and demanding a hearing.
52. Under date of February 25,1953, Barr wrote Madigan and Matteo that their replies had been given careful and deliberate consideration but that it was the decision of the agency that they be temporarily suspended for 30 days without pay, effective February 25, 1953, during which period further consideration would be given to ultimate disciplinary action.
53. On February 26, 1953, Barr wrote the Acting Comptroller General and requested his advice as to the legality of the lump sum leave payments.
54. Under date of February 26, 1953, plaintiff, as well as Matteo and Dupree, appealed to the Administrator, Economic Stabilization Agency, Arthur S. Flemming, from Barr’s action and requested a hearing. Flemming immediately arranged for an advisory board consisting of Edward Kemp, formerly General Counsel, Bureau of the Budget, Kenneth Vipond, formerly Assistant Executive Director, Civil Service Commission, and E. Ray Ballinger, formerly Assistant to the Comptroller General, to make recommendations to him, and, on February 26, 1957, so advised the appellants and the Acting Director of ORS.
55. On March 4, 1953, the Comptroller General, Lindsay Warren, wrote Chairman Phillips of the House Appropriations Subcommittee on Independent Offices as follows:
Reference is made to your recent conversations with Mr. Weitzel and Mr. Keller of my staff concerning the full import of the Acting Comptroller General’s report of February 20,1953, with respect to the lump-sum leave payments made to employees of the Office of Rent Stabilization in 1950 and 195L
In my judgment and in the judgment of Mr. Yates, who in my absence sent the report of February 20 to you, the payments made by the Office of Rent Stabilization were in bad faith, being the result of a contrived series *688 of personnel actions, and for that reason were illegal. The payments violated the intent of the annual- and sick-leave law then in effect. The payments were an improper charge against the appropriation for the Office of Sent Stabilization for the fiscal year 1950. Payments made in June 1950 were charged against the 1950 appropriation, whereas under proper circumstances any charges applicable to these leave accumulations would have been made against 1951 or later appropriations, depending upon the circumstances in each case.
The General Accounting Office will take every possible step to see that in any case where the transactions in 1950 or 1951 resulted in an additional cost or liability to the Government appropriate collection or adjustment in leave accounts will be made. To that end, the Acting Director, Office of Kent Stabilization, has been requested to transmit to the General Accounting Office for settlement any proposed lump-sum leave payments to employees of the agency, as well as any final salary due employees upon termination of their services. The Acting Director has agreed to this request.
Also, by decision of today, a previous ruling of the Comptroller General was modified. The new decision holds that under the 1951 Annual and Sick Leave Act an employee who leaves a permanent position and receives a lump-sum leave payment for his accrued annual leave must upon reemployment in a temporary position make refund of the leave payment even though there was a break in service between the permanent appointment and temporary appointment and notwithstanding under the present law the employee is not credited with annual leave until after 90 days of service. The decision of today and the provisions of the 1951 Leave Act preclude the possibility of recurrence of a situation such as happened in the Kent Stabilization case.
56. On March 5, 1953, the Executive Director of the Civil Service Commission wrote plaintiff in reply to the latter’s inquiry of February 11 that his suspension by letter of February 9 had been withdrawn by OES, that he had been placed on annual leave and given an advance notice of suspension February 12, and that, as the proper procedure was being followed, no further Commission action was required.
57. Hearings were held by the Appeal Flearing Board, referred to in finding 54, on March 4, 5, 6, and 13,1957. The recommendations made by the Board on March 25, 1953, appear in finding 60a, infra.
*689 58. a. On March 9, 1953, the Comptroller General issued a formal notice of exception to the Certifying and Disbursing Officers of OHE because of the payments made on the June 11-24, 1950, payrolls, to plaintiff and others in the sum of $89,266.65, of which plaintiff received $4,254.91 for 807 hours and two holidays. The Comptroller stated:
The processing of temporary appointments to employees holding permanent positions for the sole purpose of making payments for accumulated and current accrued annual leave was not bona fide and did not constitute transfers to different leave systems under office decision of October 24,1946,26 Comp. Gen. 259. Therefore, such payments were improper. See report of the Acting Comptroller General on this matter dated February 20, 1953, B-113811. Eevisions of this exception will be issued to cover adjustments or recredits of annual leave resulting from reconstruction of leave accounts of the time of transfer or separation from the service of the involved employees.
b. On March 10, 1953, the Comptroller General issued similar notices for payments made on the OHE payrolls of November 26 to December 23,1950, to 7 employees, including plaintiff, who had been paid $413.60 for 80 hours of leave. The Comptroller stated:
The original processing of temporary appointments to employees holding permanent positions for the sole purpose of making payments for accumulated and current accrued annual leave, not being bona fide, and not constituting transfers to different leave systems under Office decision of October 24, 1946, 26 Comp. Gen. 259, has been held by this Office to have been improper * * *.
59. a. The Executive Director of the Civil Service Commission replied to Mr. Barr’s inquiry of February 17 (finding 49) on March 23,1953, stating in part as follows:
Seven of the 25 employees whom you list were not actually reinstated but were given unlimited excepted appointments. The Whitten Amendment and Executive Order No. 10180 issued to effectuate its purposes did not give the Commission any jurisdiction over excepted appointments, but placed the responsibility for applying the Whitten Amendment to them on the head of the employing agency. The head of the agency has the same authority to authorize permanent excepted appointments *690 as the Commission has to authorize probational competitive appointments.
When the actual reinstatements were processed in the 18 remaining cases, 12 on October 26, 1950, and six on November 26, 1950, the Whitten Amendment was in effect requiring all reinstatements to be temporary. The Commission in Transmittal Sheet No. 316, dated November 13,1950, notified agencies as follows: “If, in the case of reinstatements, inter-agency transfers, and promotions effected after September 1, 1950, the employees were not notified of the temporary limitation on such actions as required by section 1302 of the Supplemental Appropriations Act, 1951, they should now be so notified in writing. Agencies may do this by issuing a general notice to all employees and correcting the individual notices of personnel action (Standard Form 50) upon a subsequent change of position.”
However, effective August 15, 1952, the civil service regulations were amended to provide that a permanent employee with competitive status who is separated from a competitive position by reduction in force will have retention preference as a permanent employee upon reemployment within a year (Transmittal Sheet No. 398, dated August 26, 1952). Transmittal Sheet No. 402, dated October 14,1952, directed conversion to permanent tenure in the cases of employees who had been so separated and had been reemployed between September 1, 1950 and August 15,1952, and were still serving. Thus, these employees are now permanent.
The Comptroller General has recently held that the personnel transactions in 1950 which purported to change these employees from permanent to temporary were not bona fide transactions, at least for pay purposes. If this conclusion were applied for tenure purposes as well as pay purposes, it would mean that the employees were never changed to temporary, and have been permanent at all times. Since this would not change their present status in any way, but would leave them exactly as they are, no purpose would appear to be served by requiring retroactive correction of the personnel actions.
Accordingly, the four specific questions you ask are answered as follows:
1. The reinstatements made on October 26 and November 26, 1950, were not effective to confer permanent tenure at that time, because the Whitten Amendment required reinstatements to be temporary.
2. No corrective personnel actions appear to be appropriate at this time, because intervening changes in regu *691 lations would have converted the employees to the same tenure they would have had if the personnel actions in question had never been processed.
3. We know of no other statutes or regulations which were violated by the reinstatements.
4. The answer to question 3 makes answer to this question unnecessary.
Nevertheless, the Commission is of the opinion that the personnel actions which were taken involved an improper use of Commission regulations to accomplish an improper purpose, and are not bona fide personnel actions.
b. Similar information was contained in a report dated March 25, 1953, from the Executive Director of the Civil Service Commission to Chairman Phillips of the House A-ppropriations Subcommittee on Independent Offices.
60. a. On March 25, 1953, the Advisory Board convened by the Acting Economic Stabilization Administrator made the following recommendations:
1. That Mr. Barr be commended for his good judgment in objecting to the so-called Plan X at the time it was proposed in June, 1950, and for his concern in maintaining the good name of the Office of Bent Stabilization.
2. That the suspensions without pay, based on actions taken nearly three years ago, which actions were approved by the then head of the agency, be revoked, and that the employees be restored to duty.
3. That Mr. Madigan be admonished for his failure as Deputy Administrator to advise the Housing Expediter of the impropriety of applying Plan X to a limited number of individual employees.
4. That Mr. Barr, the present Acting Director of Bent Stabilization, be advised that if he has reasons to doubt the full loyalty and support of any of his subordinates and has any substantial evidence justifying such a doubt, there is ample authority within regular procedure for displacing such employees.
b. On April 9, 1953, Flemming wrote Barr that he had reviewed “the entire record” “and given the problems involved my most careful consideration” and, notwithstanding the recommendations of the Board, had concluded the action taken was within his authority, not an abuse of discretion, and should be affirmed. Flemming stated:
*692 Because of the importance of the questions presented by this appeal, a brief statement of my reasons for affirming the disciplinary action which you have taken is appropriate.
I conceive it to be within my jurisdiction in an appeal of this nature to pass upon two questions: first, whether or not the procedural rights of the appellants have been respected and, second, whether or not there is evidence to support your conclusion that the suspension of the employees was in the interest of and for the promotion of the efficiency of the governmental service. If the action which you took was within the scope of your authority and not so grossly insufficient or excessive as to constitute arbitrary action, I am of the opinion that any change in your decision would be merely the substitution of my judgment for yours. I would not consider that proper in the light of your direct responsibility for the conduct of the affairs of the Office of Bent Stabilization.
This case arises out of a proposal made in June 1950, when the extension of the rent control authority was under consideration by the Congress and appropriated operating funds were virtually exhausted, for the mass transfer of several hundred agency employees from permanent positions in the Federal service to temporary positions with identical responsibilities. The alleged purpose of the plan was to reduce the carryover to the next fiscal year of accrued annual leave and to aid in maintaining a working force in being for the conduct of operations under such continuing authority for rent control as the Congress might grant.
I consider the plan to have been ill-conceived for either of the stated purposes and believe that it should have been rejected. The plan was considered by the responsible head of the agency as too complicated for general use. Its use by individual employees was approved by the head of the agency either expressly or by implication.
Whatever justification may have been claimed by the proponents of the original plan, in terms of benefit to the agency, would seem to be reduced to the vanishing point by the use of the plan in a few individual cases. Such limited use could not substantially reduce the accrued leave obligation of the agency and could serve to preserve a working force only in terms of the small number participating. The plan as put into effect should have been recognized by anyone familiar with Federal employment practices as a gross impropriety.
*693 The three employees against whom you have taken disciplinary action must be presumed, based on their Government experience and the positions they occupied in the agency, to be generally familiar with Federal employment practices. Their participation in the plan cannot, therefore, be excused upon the ground that they did not recognize its impropriety. It is, of course, very significant that the responsible head of the agency approved the action taken, but it is also significant that the appellants were among those to whom the head of the agency would logically look for advice on the merits of the plan.
Much of the record of the case deals with such questions as the legality of the plan, the extent to which reinstatement of the employees to permanent positions was a part of the plan, the informal clearance of the plan by the General Accounting Office, the failure of the GAO to take exception to payments under the plan on post-audit, and the personal relationships among the appellants and between the appellants and yourself. I am of the opinion that conclusions on all of these issues most favorable to the appellants would not serve to invalidate the action that you have taken.
I recognize that the General Accounting Office has taken action to recover any additional cost or liability to the Government resulting from use of the plan. This action, however, does not constitute a penalty for actions which have violated the standards which should prevail in the Federal service and which have injured, therefore, the good name of the service.
I am, therefore, advising the appellants by letter today that after consideration of their appeals the disciplinary action taken against them is affirmed. I shall furnish them copies of this letter.
61. On March 24,1953, plaintiff was placed on leave without pay and, on April 2, 1953, appealed to the Civil Service Commission. However, the Commission, on April 14, advised plaintiff that, under existing circumstances, it would not intervene or entertain the appeal. The Director of Kent Stabilization, Glenwood J. Sherraid, removed plaintiff and Mrs. Matteo from office April 23,1953, because the 1950 personnel action was “not bona fide and not legal.” On appeal Mr. Flemming, on June 10,1953, directed that the dismissal actions be revoked and that they be restored to the rolls, plaintiff having retired and Mrs. Matteo having been sepa *694 rated by reduction in force both, effective April 30, 1953. The removal actions were consequently canceled retroactively on June 17, 1953, “on the basis that there are no circumstances warranting removal.”
62. On April 23, 1953, the Comptroller General wrote the OES Certifying Officer with respect to the exceptions totaling $123,714.71 taken with respect to terminal leave payments made to 53 employees, stating that the annual leave accounts should be reconstructed and excessive leave payments recaptured. The 49 employees originally involved had been paid a total of $100,971.71 (gross) upon transfer to temporary status and $10,988.51 when transferred back to permanent status. Four other employees were similarly paid $10,449.63 and $1,556.66.
63. On April 9,1953, the Acting Director of Eent Stabilization had written the Civil Service Commission that OES was considering taking corrective action by canceling the 1950 EIF, Temporary Appointment, and Conversion to Ee-instatement Actions. On May 23,1953, the Executive Director of the Commission replied as follows:
We do not believe that these personnel records should cause any confusion among agencies to which they might be transferred. The question of whether the individuals were temporary or permanent during the period in question would not be a factor in determining their tenure or status in a future employment. On the other hand, personnel actions purporting to cancel the actions in 1950 might cause confusion in pay matters and give rise to claims in some cases. We understand, for example, that the General Accounting Office intends to let the lump-sum payments at that time stand in those cases where the individual would now be entitled to a higher payment if the earlier one were invalidated. If a retroactive cancellation of the personnel actions were legally effective, it could give rise to a claim in those cases that the earlier payment was erroneous and that the individual was entitled to the difference in the value of his leave at the date of later separation. As another example, if any of the employees would have received within-grade increases during the period in question but for the fact that their appointments were temporary, an action purporting to show them as permanent during the entire period would make the failure to increase their salaries by one step at that time appear as incorrect.
*695 64. No notice of personnel action revoking or canceling the personnel actions made in 1950 affecting plaintiff has ever been issued by the Civil Service Commission or any other Government agency.
65. The parties have stipulated that, if plaintiff as a matter of law is entitled to recover, the amount of the recovery should be $2,960.84, representing the sum of (a) $1,242.23, payable for 219 hours of annual leave, and (5) $1,718.61, withheld from his retirement annuity.
CONCLUSION OE LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is entitled to recover, and it is therefore adjudged and ordered that he recover of and from the United States two thousand nine hundred sixty dollars and eighty-four cents ($2,960.84).

 The Senate later changed this to June 80, 1951

The Act was repealed October 30, 1951, C. 631, Title II, § 207 (a) (1) (65 Stat. 682).

 Miss Donine understood from Mrs. Matteo, Mr. Madigan and Mr. Comfort that the employees were to be asked to accept lump sum payments to liquidate their terminal leave and to take 30- or 60-day appointments until the status of OHH was determined; also that the employees would go on a week’s leave without pay.

 The Regulation included in the Federal Personnel Manual and in Civil Service Commission Transmittal Sheet No. 294, dated April 18,1950, provided:
Sec. 2.114 Temporary appointment — (a) Pending establishment of register. * * *
(b) Job employment. When there is work of a temporary character, at the completion of which the services of an additional employee will not be required, a temporary appointment for job employment may be made, with the prior approval of the Commission, for a period not to exceed 6 months. Such appointments, when made for a period of less than 6 months, may be extended without prior approval of the Commission for a period or periods not extending beyond 6 months from the date of original appointment. The prior approval of the Commission must be obtained for any extension beyond the total period of 6 months. Such extensions will generally be approved only if an adequate showing is made that the extension is necessary to complete the job for which the person was originally employed. *****
(8) Based on reinstatement or transfer eligibility. The Commission hereby delegates authority to agencies to appoint for temporary job employment, without regard to registers of eligibles, persons who have eligibility for reinstatement under Part 7 of this chapter or for interagency transfer under Part 8 of this chapter. The agency shall determine that the appointee meets the qualifications standards prescribed by the Commission and that he is not disqualified under section 2.104 of this part. The agency must, however, obtain a decision from the Commission whenever it is necessary to determine whether any applicant is disqualified because of physical unfitness.

 The funds Rad previously been made available by Public Law 529, 81st Congress, approved May 26, 1950, which appropriated the funds provided by H. R. 8567.

 “By Departmental Circular No. 638, dated September 8, 1950, addressed to the Heads of Departments and Independent Establishments the Civil Service Commission advised with reference to P. L. 752, approved September 2, 1950 (64 Stat. 577), that the Supplemental Appropriation Act of 1951, as passed by the House of Representatives, placed certain restrictions on reinstatements, and provided:
* * * all reinstatements, transfers or promotions to positions subject to the Classic cation Act of 1949 shall be temporary and shall be made with the condition and notice to the individual reinstated, transferred or promoted that the classification grade Qf the position is subject to post-audit and correction by the appropriate departmental or agency personnel office or the Civil Service Commission; * * *.

 H. R. 9920, P. L. 911, 81st Cong., made an additional $1,200,000 available for salaries and expenses.

 “No mention was made of the second lump-sum payments of accumulated leave or the authority for such appointments.

 On February 6 and 7, 1953, plaintiff also wrote letters to the Chairmen of the House and Senate Appropriation Committees, Mr. Taber and Senator Bridges, and also wrote to Congressman Phillips ashing an opportunity to be heard. At this time Barr’s appointment as Acting Director of Rent Stabilization was pending confirmation and it is reasonable to conclude that the sudden renewal of his concern over the 1950 personnel actions in OHB was motivated as much by a desire to protect his appointment as by a wish to protect the integrity of the agency by condemning the alleged miscreants.

 Despite this, in late 1950 Barr personally approved of the requests by two officials of the OHB to subscribe to the Madigan plan, although he himself did not participate and presumably retained his reservations to its propriety.